15895

BROWN v. PRUDENTIAL INS. CO. OF AMERICA *ET AL.*

(40 S. E. (2d), 637)

*Messrs. Daniel & Russell,* of Spartanburg, for the Russell and Taylor Appellants,

*Messrs. Carlisle, Brown & Carlisle,* of Spartanburg, for the Brown and Sanders Appellants-Respondents,

*Mr. Venable Vermont,* of Spartanburg, for Charles P. Logan, and others, Appellants-Respondents,

December 2, 1946.

*Per Curiam:* This is a rather unique and interesting case, which relates to the title to an area of vacant land in the general shape of a quadrangle, measuring about sixty-three (63) feet on the north, with a rear width of about fifty-seven (57) feet and sides of about sixty-three (63) and forty-six (46) feet, lying in the center of the business district of the City of Spartanburg, surrounded on the east, south and west by eleven lots occupied by store buildings, and on the north fronting on the street now called Kennedy Place but formerly called Harris Street; the same having been used as a court or common for nearly a century.

This action was commenced on February 21, 1938, to quiet the title to this vacant area, the plaintiff alleging that she had an interest therein as a tenant in common with others, and that there had arisen "certain questions respecting the title to said vacant lot and the legal rights of the parties." And as will appear by reference to the complete

heading of the cause, there are numerous defendants, a number of whom filed answers to the complaint. Due to the frequent transfers of title to the building lots surrounding the area in question many orders have been passed bringing in new defendants by way of substitution and otherwise. But fortunately the parties to the cause were treated in the Circuit Court, and may be so treated here, in certain groups, to wit, the Sanders Group and the Taylor-Russell Group. There is also an additional group, which we may appropriately designate as the Logan Group, to which specific reference will hereinafter be made.

The cause was on December 10, 1938, duly referred to the Master for Spartanburg County, under a general order of reference. The Master held many references and took much testimony, documentary and otherwise, as the case extended over a period of years, finally resulting, however, in the report of the Master, wherein he dealt with the issues involved in an elaborate and painstaking manner, this report being filed May 16, 1945. Some of the Master's conclusions were satisfactory to all parties, but there were numerous exceptions to his findings on the major issues.

The cause was then heard upon these exceptions by Honorable T. S. Sease, Judge of the Seventh Circuit, who handed down his decree filed January 19, 1946, wherein it was adjudged that the vacant area of land involved in this cause, which was originally acquired by the parties in interest under a deed executed by Simpson Bobo in 1854, was a servient common or court dominated by the eleven abutting building lots, the same having been so created and maintained by mutual agreement, so that the owners of each of the building lots, for the benefit of which the common existed, had equal rights of use therein, coupled with an undivided interest in the ultimate fee; and a sale of the common at public auction, with the allowance of a fee for plaintiff's attorneys, was ordered. On the other hand, the Master had held in substance that the vacant area of land was independent of the ownership of the building lots, and no ease-

ment therein was appurtenant thereto, but that it was merely an additional parcel of land owned by certain of the parties as tenants in common.

The decree of Judge Sease was apparently not entirely satisfactory to any of the groups interested in the controversy. Hence the Taylor-Russell Group are referred to as respondents-appellants, while the other two groups are referred to as appellants-respondents. Indeed, the Sanders Group and the Logan Group might well be simply called appellants, since they are respondents with reference to minor matters only; and likewise, the Taylor-Russell Group might well be simply called respondents, since their appeal relates only to the matter of the allowance of a fee for plaintiff's attorneys for their services in the cause.

While there are a number of exceptions, we think they raise three questions only, which may be briefly stated as follows:

1. What is the nature of the title acquired under the Simpson Bobo deed of 1854 to the vacant area in question, and by whom and how is the same now owned?

2. Should the Court have ordered the premises sold for partition?

3. Should the Court have allowed a fee of Seven Hundred ($700.00) Dollars to the attorneys for the plaintiff, a member of the Sanders Group, payable out of the proceeds of sale as a part of the costs of the action?

Each of the questions will now be considered by us.

1. What is the nature of the title acquired under the Simpson Bobo deed of 1854 to the vacant area in question, and by whom and how is the same now owned?

In order to arrive at a correct answer to this question it will, of course, be necessary first to consider the basic documents out of which the title arises, for they really determine the rights and interests of the respective parties. The first

one of these is an agreement dated November 25, 1849, executed by eight persons, including Simpson Bobo, Esq., a lawyer of distinction. And it therein appears that a parcel of land in the heart of the business district of the City of Spartanburg was about to be sold and conveyed by the Commissioner in Equity, and the parties to the agreement thereby agreed to purchase this property for the prices therein mentioned, and the parcel thus agreed to be purchased included certain building lots and also the vacant area in question, which fronted on the north on the street then called Harris Street, but later known as Kennedy Place. This agreement contained the following important and significant sentence: "It is further agreed that the land *back of lots laid off for buildings to be permanently kept as common property.*" (Emphasis added.) The agreement also stated that the deed was "to be made by the Comr. in Equity to S. Bobo, who is to convey to the purchasers."

Mr. Bobo, on December 25, 1849, executed an acknowledgment in the nature of a declaration of trust in which he covenanted that as soon as the last installment was due on the purchase price he would make a deed *"agreeable to the true intent and meaning of the above agreement."* (Emphasis added.) This declaration of trust referred to a modification of the original agreement whereby a certain portion of the land lying to the north of Harris Street was to be conveyed to one L. C. Kennedy, this particular lot, however, having no connection whatever with the controversy involved in the instant case.

On October 25, 1854, nearly five years after the original agreement was executed, Simpson Bobo, having acquired title from the Commissioner in Equity by deed dated September 29, 1854, executed and delivered his deed of conveyance pursuant to the trust agreement; and this deed recites that it was made in consideration of the original agreement dated November 25, 1849; and the granting clause is as follows: "unto the following persons, now the owners of said property by transfer and otherwise, to wit: (fifteen

grantees are here named, including L. C. Kennedy and Mr. Bobo himself), the lots of land described and marked in their names in a plat hereunto attached made and certified by W. C. Camp on the 30th day of August last. This conveyance subject to the conditions and conveying all the right, title, interest and privileges entered into by the agreement above referred to, to which reference is specifically made by these presents, the said lots are *respectively and severally* conveyed to each of the parties their heirs and assigns forever fully and under all the legal liabilities as T. O. P. Vernon, Esq., Commissioner in Equity for said District conveyed to me, and it is further understood that this deed conveys *all the property embraced in the plat aforesaid according to the terms and conditions of the agreement aforesaid.* To have and to hold all and singular the premises aforesaid to the parties aforesaid in way and manner aforesaid, to them, their heirs and assigns forever." (Emphasis added.)

It is therefore clear that the plat made by W. C. Camp, D. S., August 30, 1854, is a necessary and integral part of the deed, and this plat, the original of which was introduced in evidence, is most illuminating. It shows the surrounding building lots as thirteen in number, five of which front on North Church Street, five on Main Street, and three on the Public Square (now Morgan Square); and on each of these lots as delineated on the plat the name or names of the purchaser or purchasers are written. And the vacant area or common is shown as located *back of the building lots.* It should also be stated that this plat and all the muniments of title aforesaid were simultaneously recorded, and must of course be construed together. It should further be stated that the vacant area in question, as shown by the undisputed evidence, was continuously used as a court or common for the benefit of the adjacent building lots, by the owners thereof respectively, the same affording valuable and convenient rights of ingress and egress to and from the rear of the store buildings, including uses such as parking and the like, and that the vacant space

was also of use as affording additional light and air. Indeed, the evidence is undisputed that the area for well nigh a century has constituted a common, which perhaps might better be described as a *court,* which is defined in the Century Dictionary as follows: "An inclosed space connected with a building or buildings of any kind, and serving properly for their particular uses or services; a courtyard."

The creation and maintenance of this court or common, in our judgment, is precisely in accordance with the agreement of the parties as shown by the muniments of title above referred to, including the Camp plat. Clearly also the agreement of the parties contemplated that the right of user acquired by the owners of the building lots as such, respectively, was in the nature of an easement, appurtenant to the building lots, so that any transfer of a building lot carried with it the rights of the grantor in the court or common, whether so expressed in the deed of conveyance or not. This construction of the transaction, as indicated by the written instruments, is confirmed in the clearest possible way by the construction that the parties themselves have placed thereon during the long period of about ninety years before the commencement of this action; and the resulting arrangement must have been quite satisfactory throughout this period of time, for although it appears that some encroachments had been made upon the common, the Master rightly held, and there was no exception to this finding, that no such encroachment had ever ripened into a title (no question of adverse possession has arisen therefrom.)

It will be recalled that the Camp plat showed the building lots as thirteen in number, but in the year 1901 the City of Spartanburg acquired two of these lots, one by purchase and one by condemnation, for the purpose of enlarging Harris Street, now known as Kennedy Place, and the same were used for such purpose, so that the adjoining building lots are now eleven in number.

As has already been indicated, the learned Master took a different view of the transaction from that we have above stated; but we think the fundamental fallacy in his theory is that he considered the vacant area as really having no legal connection with the building lots, but that it was merely an additional lot or parcel of land owned by the eight parties to the 1849 agreement and their successors in title as tenants in common. Indeed, he held that none of the owners of the Church Street lots had any interests in the vacant area, although it lies back of these lots as well as all the others; and we are in full agreement with Judge Sease that all the lots occupy the identical status, especially in view of the Simpson Bobo deed of 1854. Indeed, we are in accord with the conclusion of Judge Sease wherein he adjudged:

"That the vacant area involved in this action is a servient common or court dominated by the abutting building lots, eleven in number, each lot carrying a participation of one-eleventh in the court or common; that the encroachments shown or existing and projecting into the common property, are encroachments only and no title thereto or to the portion of the common occupied by them or any of them has been matured in or acquired by any of those creating or maintaining such encroachments or any of them; that the said vacant area is now owned in the following shares or interests—one-eleventh undivided interest by the 'Sanders group,' as defined in the Master's Report, and ten-elevenths by the 'Taylor-Russell group,' as it is called in the Master's Report; that the one-eleventh owned by the 'Sanders group,' having no building lot owned by them which it can serve, can be made of value to the owners only by a sale of the entire vacant area and a division to the 'Sanders group' of one-eleventh of the net proceeds, and to the 'Taylor-Russell group' of ten-elevenths of such proceeds."

The Circuit decree also further provides that the vacant area be sold at public auction by the Master for Spartanburg County, Seven Thousand ($7,000.00) Dollars being

declared as a minimum upset price; and it is also provided that from the proceeds of sale the Master shall pay the costs of this action including an attorney's fee of Seven Hundred ($700.00) Dollars to plaintiff's attorney.

As we have heretofore indicated there were numerous transfers of title in the progress of the years and the building lots have frequently changed hands. Some of the deeds made express reference to the vacant area or common, while others made no such reference, and one of the deeds in the later category was that made by Mr. Bobo himself, who must have had accurate knowledge of the legal status of the title. It should also be stated that there is a group of defendants which we have designated as the Logan Group who have no interest or claim in the building lots but claim an interest in the vacant area as heirs-at-law or devisees of the former owners of an interest in one of the lots, "who did not include an express reference to any interest in the vacant area when they sold their interests in the dominant lot."

For the reasons already suggested, we are of the opinion that upon the conveyance of a building lot or an interest therein, whether any reference was made to the vacant area or common or not, all the right, title and interest of the grantor in the common passed as a matter of law to the grantee, with the single exception of a conveyance made by the Sanders Group to Sidney Kosch, one of the defendants, to which particular reference will hereinafter be made.

It should be observed that our construction of the effect of this class of conveyances is strongly fortified and confirmed by the construction placed thereon by the parties themselves, for they evidently assumed, and acted upon the assumption, that such a deed would in effect carry all rights and interests in the common; and prior to the institution of this action, all parties concerned appear to have fully acquiesced in such assumption, and are now estopped to take a contrary position.

It is quite true that while commons have long been known to the law, they have perhaps more often consisted of areas dedicated to the use of the public, and that at common law the common usually belonged to the lord of the manor, being used by his tenants in connection with the lands held by them for the taking of some profit therefrom, such as pasturage and the like. But we can discern no good reason why a court or common could not be set aside and maintained for the benefit of the owners of adjoining property as such. In other words, we see no reason why a private common may not be set apart and maintained, as was done in this case. For certainly the agreement of the parties was bona fide and manifestly subserved a useful purpose, and so should be sustained by the Court, unless prevented by some rule of law, and we find none whatever.

The following authorities cited by counsel for the Taylor-Russell Group in their brief appear to us to sustain the conclusions which we have indicated, to wit:

In the case of *Trustees of Western University v. Robinson* (Penna.), 12 Serg. & R., 29, 31, it was held: "Common is an estate well known to the law. It is an incorporeal hereditament giving to the owner of one tract of land the privilege of common in other lands. It is a privilege annexed to the land and passing by a conveyance of the land to which it is annexed."

And the Court says in *Knowles v. Nichols,* 2 R. I., 198: "The term 'common' by no rules of interpretation can be construed to mean a lot to be held by several as tenants in common but as a lot in which several are to have common of some sort."

The case of *West End Development Co. v. Thomas,* 92 S. C., 229, 75 S. E., 450, cited in the briefs of counsel, throws no light on the matter under discussion, for while it relates to a common, it merely holds that abutting owners could acquire no easement *over land held for the public.*

And it is quite true, as pointed out by counsel for the Sanders Group, that one parcel of land itself cannot be appurtenant to another, as was held in the case of *Humphreys v. McKissock,* 140 U. S., 304, 35 L. Ed., 473; and it was held in our own case of *Witter v. Harvey,* 1 McC., 67, that: "One separate and distinct piece of land cannot be an appurtenance to another." As a corollary to this rule, a party of course could not be deemed to have an easement in land of which he is the sole owner.

But these principles have no application under the facts of this case, and the Circuit decree is not in conflict with them. The record before us shows that in the same transaction and by the same deed conveying the building lots in severalty the vacant area was acquired as and for a common or court to be kept for that purpose. The *easement* thus created was acquired by each owner of a building lot *from the other parties to the transaction,* by virtue of the express terms of the original deed and the agreement upon which it was based; and its character as an appurtenance to the building lot is not abrogated merely because there is coupled with it an undivided interest in the *ultimate* fee of the vacant area.

After the Master's report was filed, the Sanders Group conveyed their building lot to Sidney Kosch, who was already a defendant in the cause, and in the deed to him no reference was made to any interest in the vacant area; but as shown in the decree of Judge Sease, it is indisputable that Mr. Kosch and the grantors all understood and intended that whatever interests attached to the building lot in the vacant area should remain the property of the Sanders Group. And it was the opinion of Judge Sease that the Sanders Group should therefore be treated as owning an undivided eleventh interest in the vacant area. We think this conclusion was correct under the peculiar circumstances and the application of the principles of *equity,* although strictly as a matter of *law* the effect would have been to the contrary.

2. Should the Court have ordered the premises sold for partition?

Judge Sease concluded that the Sanders Group are the owners of one undivided eleventh interest in the vacant area in question under the construction of the transaction with Mr. Kosch as above stated, and that the Taylor-Russel Group (the owners of the remainder of the building lots) are the owners of ten-elevenths undivided interest in the vacant area. We think Judge Sease rightly concluded that since the Sanders Group had no building lot owned by them which the common or court could serve, such interest could be made of value to them only by a sale of the entire vacant area and a division of the net proceeds; the Taylor-Russell Group making no objection to the sale. Of course, it is obvious that such a sale will result in the final extinguishment of the common or court, and all the evident benefits it has afforded in the past will be gone; but doubtless the Taylor-Russell Group were of the opinion that because of the progress of the City of Spartanburg resulting in the enhancement in value of the vacant area needed for building purposes, the proposed sale would be advisable. The Sanders Group have no ground for complaint, and the Taylor-Russell Group consenting, we think the question before us should be answered in the affirmative.

The only remaining question is the following:

3. Should the Court have allowed a fee of Seven Hundred ($700.00) Dollars to the attorneys for the plaintiff, a member of the Sanders Group, payable out of the proceeds of sale as a part of the costs of the action?

The contention is made in behalf of the Taylor-Russell Group that counsel for the plaintiff should look to their clients for a fee instead of to the proceeds of sale of the property, in accordance with the rule applied in partition cases, and counsel for the Sanders Group, which includes the plaintiff, contend that the fixing of the amount of the fee by

the Circuit Judge was premature, and it is indicated that they do not regard the amount allowed as adequate.

We believe the Circuit Judge was correct as to this matter. The institution and prosecution of the cause does indeed result, as Judge Sease says, in bringing about a solution "of all the problems attending or incident to the vacant area" and in an order for its sale, which he says "was plainly desired by all parties to the suit adjudged to have any interest in the common".

And we are further of the opinion that the allowance of Seven Hundred ($700.00) Dollars, one-tenth of the upset price, was timely and reasonable, there being no necessity whatsoever for any testimony thereon to be taken by the Circuit Judge, who was necessarily familiar with the amount of work performed by the plaintiff's counsel. Hence the third question should likewise be answered in the affirmative.

All the exceptions are overruled and the decree of the Circuit Court is Affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES, TAYLOR and OXNER concur.